UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| BILLY IRVIN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 12-169-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| CAROLYN COLVIN, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Plaintiff, Billy Irvin, brought this action pursuant to 42 U.S.C. §§ 405(g) to obtain judicial review of an administrative decision of the Commissioner of Social Security (Commissioner) denying Irvin's application for disability insurance benefits (DIB) and supplemental security income (SSI).  The Court, having reviewed the record and for the reasons set forth herein, will deny Irvin's Motion for Summary Judgment [R. 12] and grant the Commissioner's [R. 13].

I

Irvin protectively filed applications for DIB and SSI on February 19, 2010. [Transcript (Tr.) 119; Tr. 126].  He alleges a disability beginning on February 23, 2011, due to rheumatoid arthritis. [R. 12-1 at 2].  Irvin's applications were denied initially [Tr. 64; Tr. 65] and upon reconsideration [Tr. 66; Tr. 67].  Subsequently, at Irvin's request, an administrative hearing was conducted before Administrative Law Judge Todd Spangler (ALJ) on November 9, 2010. [Tr. 23-63].  During the hearing, the ALJ heard testimony from Irvin and vocational expert (VE) Dr. Julian M. Nodolsky. [Tr. 47-57].  Irvin, who was forty-five years old at the time of the hearing,

had a high school education via general education diploma (GED). [Tr. 119; Tr. 17].  Irvin has

past relevant work experience as a tree trimmer, and though the VE testified that he could no

longer perform that work, he found that there are jobs that exist in significant numbers in the

national economy that the Irvin could perform, and the ALJ accepted that testimony. [Tr. 17-18.]

In evaluating a claim of disability, an ALJ conducts a five-step analysis.  *See* 20 C.F.R.

§§ 404.1520, 416.920.[1]  First, if a claimant is working at a substantial gainful activity, she is not

disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit her physical or mental ability to do basic

work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. §

404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a

claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20

C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional

capacity, age, education, and past work) prevent her from doing other work that exists in the

national economy, then she is disabled.  20 C.F.R. § 404.1520(f).

In this case, at Step 1, the ALJ found that Irvin has not engaged in substantial gainful

activity since February 17, 2010, the alleged onset date. [Tr. 14.]  At Step 2, the ALJ found that

---

[1] The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step
> inquiry defined in 20 C.F.R. § 404.1520.  Through step four, the claimant bears the burden of
> proving the existence and severity of limitations caused by her impairments and the fact that she is
> precluded from performing her past relevant work, but at step five of the inquiry, which is the
> focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in
> the economy that accommodate the claimant's residual functional capacity (determined at step
> four) and vocational profile.

*Id.* at 474 (internal citations omitted).

Irvin's rheumatoid arthritis constituted a severe impairment. [*Id.*]  At Step 3, the ALJ found that Irvin's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. [Tr. 14].  At Step 4, the ALJ determined that Irvin is unable to perform any past relevant work.  [Tr. 17].  However, at Step 5 the ALJ relied on the testimony of the VE to find that, based on Irvin's residual functional capacity, there are jobs that exist in significant numbers in the national economy that Irvin could perform.  [*Id.*]  Accordingly, on February 23, 2011, the ALJ issued an unfavorable decision, finding that Irvin was not disabled, and therefore, ineligible for DIB and SSI.  [Tr. 18].  The Appeals Council declined to review the ALJ's decision on June 27, 2012 [Tr. 1-3] and Irvin  now seeks judicial review in this Court.

## II

This Court's review is limited to whether there is substantial evidence in the record to support the ALJ's decision.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987).  "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (quotes and citations omitted).

In determining the existence of substantial evidence, courts must examine the record as a whole. *Id.* (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983)).  However, courts are not to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations. *Id.* (citations omitted); *see also Bradley*

*v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Rather, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999); *see also Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983); *Mullen*, 800 F.2d at 545.

## A

Irvin first argues that the ALJ did not adequately address whether his rheumatoid arthritis satisfied Listing 14.09. At Step Three of the disability analysis, Irvin had the burden of showing that his impairments were equal or equivalent to a listed impairment. *Malone v. Comm'r of Soc. Sec.,* 507 F. App'x 470, 472 (6th Cir. 2012) (citing *Foster v. Halter,* 279 F.3d 348, 354 (6th Cir.2001). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* (quoting *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)) (emphasis in original). In his written decision, the ALJ expressly considered Irvin's impairments under Listing 14.09 and found that Irvin had failed to carry his burden as to show he met all of the listing's criteria. Specifically ALJ Spangler stated:

> The record does not show that the claimant has a major dysfunction of any joint, or signs of inflammation or deformity in two or more joints, resulting in an inability to ambulate effectively or inability to perform fine and gross movements effectively, as required by Medical Listings 1.02 and 14.09.

[Tr. 14].

As an initial matter, Irvin claims that this explanation is insufficient and requires remand under *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx. 411 (6th Cir. April 1, 2011).

4

In *Reynolds*, the ALJ began his Step 3 analysis by stating, "[c]laimant does not have an impairment or combination of impairments which, alone or in combination, meet sections 1.00 or 12.00 of the Listings." *Reynolds,* 424 F. App'x at 415 (6th Cir. 2011). The ALJ dutifully undertook a full page analysis of Listing 12.04, evaluating the evidence of the record under the criteria of that listing. However, aside from mention of section 1.00 in the introduction, the ALJ never referenced Listing 1.04 or discussed why the impairment of the claimant did not meet that listing criteria. The court found that the ALJ had erred in omitting a discussion of Listing 1.04 because, "[p]ut simply, he skipped an entire step of the necessary analysis." *Id.* at 416.

Unlike his counterpart in *Reynolds*, ALJ Spangler directly cited the listing at issue, acknowledged that he had considered it on the record, and then identified the specific criteria under the Listing that Irvin had failed to meet. [Tr. 14]. This is sufficient information to allow this Court to compare the ALJ's rationale to the record and thereby provide meaningful judicial review. Other courts in this Circuit have not interpreted *Reynolds* to mandate the kind of heightened explanation requirement Irvin seeks, and have often upheld the decisions of ALJs who have provided less explanation than ALJ Spangler. *See Hartman v. Astrue*, 3:12CV-48-S, 2013 WL 4011074 at *5 (W.D. Ky. Aug. 5, 2013); *Dove-Askin v. Astrue*, 11-119-DLB, 2012 WL 176486 (E.D. Ky. Jan. 20, 2012), *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 859-60 (E.D. Mich. 2012), *Todd v. Astrue*, 1:11-CV-1099, 2012 WL 2576435 (N.D. Ohio May 15, 2012) *report and recommendation adopted,* 1:11 CV 1099, 2012 WL 2576282 (N.D. Ohio July 3, 2012). In fact, the *Reynolds* Court itself required no more documentation than ALJ Spangler has provided, stating "[i]n short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." The ALJ's decision meets these requirements of *Reynolds* and sufficiently

5

explains why Irvin did not meet the criteria of Listing 14.09.

Further, the Court finds that ALJ Spangler's explanation and conclusion is supported by substantial evidence of the record.  Irvin takes issue with the finding of the ALJ that the record did not show that his impairment resulted in an inability to ambulate effectively or an inability to perform fine and gross movements effectively as required by Listing 14.09.  In support, Irvin cites to the conclusions of the state agency physicians, Drs. Hernandez and Loy, who found that due to postural limitations, Irvin could only climb stairs occasionally.  [Tr. 306; Tr. 360].  The Physical Residual Functional Capacity Assessment indicates that "occasionally means occurring very little to one-third of an eight hour workday." [Tr. 304].  The parties note that under Social Security Ruling 96-9p, this limitation would practically mean that Irvin could climb stairs for up to one-third of the work day, which is about 2.6 hours.  SSR 96-9p.  However, in defining, "what we mean by inability to ambulate effectively," the Social Security Administration seems to require a more severe limitation than this.  20 C.F.R. Pt. 404,Subpt. P, App. 1 § 1.00(B)(2)(b).  Specifically, the agency's regulations state that:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id*.  Examples provided by the agency of someone with an inability who is unable to ambulate effectively might be characterized by having "inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id*.  The limitations placed on Irvin by Drs. Hernandez and Loy permit climbing stairs in amounts well in excess of this definition and example, and do not support that the ALJ's determination was in error.  In addition, the evaluation of Drs. Hernandez

6

and Loy indicates that Irvin is able stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday. [Tr. 305; Tr. 359]. This suggests that Irvin is "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," which also suggests the ability to ambulate effectively under the 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b). Thus, substantial evidence supports ALJ Spangler's conclusion that the record does not show Irvin as having an inability to ambulate effectively.

Irvin states that, counter to the decision of the ALJ, the record also shows him to be unable to perform fine and gross movements effectively. He notes that Drs. Hernandez and Foy found that manipulative limitations constrained Irvin's capacity in reaching all directions, handling (gross manipulation), and fingering (fine manipulation). [Tr. 307; Tr. 361].[2] However, in describing these manipulative limitations, Drs. Hernandez and Loy indicated that Irvin could reach in all directions, handle, and finger "frequently," which is to say, between one-third to two-thirds, or about 5.3 hours, in an eight hour work day. [Tr. 304; Tr. 307; Tr. 358; Tr. 361]. In contrast, an "inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404,Subpt. P, App. 1 § 1.00(B)(2)(c). Examples provided by the agency of someone with an inability to perform fine and gross movements include those with "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id.* Not only do the limitations assessed by Drs. Hernandez and Loy not show that Irvin

---

[2] Irvin also argues that the letter from ARNP Smith further supports the extent of these restrictions [R. 407]; however, as shall be discussed, the ALJ was justified in determining that ARNP Smith's letter was entitled to little weight.

is unable to perform fine and gross movements effectively under this definition, but neither does Irvin's own characterization of his daily activities.  [Tr. 306; Tr. 361; Tr. 169].  As recognized by the ALJ in his decision, the record shows that Irvin indicated his "ability to wash the dishes, fold laundry, take out the trash, feed his cat, and prepare microwave meals."  [Tr. 16; Tr. 169].  Thus, substantial evidence supports the ALJ's conclusion that Irvin does not meet all the criteria of Listing 14.09.

B

At the next step of the analysis, ALJ Spangler reviewed the record to determine Irvin's residual functional capacity.  However, in Irvin's view, the ALJ made this determination erroneously because he improperly rejected the opinions of treating rheumatologist Dr. Jayalakshmi Pampati and ARNP Kristie Smith without providing good reasons for doing so. Under 20 C.F.R. § 404.1527(d)(2), a treating source's opinion on the issues of the nature and severity of a claimant's impairments is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).  As part of this so-called "treating physician" regulation, an ALJ is required to give "good reasons" for not giving weight to opinions from the treating physician in a disability determination.  20 C.F.R. § 404.1527(d)(2). The purpose of this requirement is to "let claimants understand the disposition of their cases," to "ensure[] that the ALJ applies the treating physician rule," and to "permit[] meaningful review of the ALJ's application of the rule." *Wilson,* 378 F.3d at 544 (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5; *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999); *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004)); *see also Gayheart v. Commissioner of Social Security*, 710 F.3d 365,

376 (6th Cir. 2013).

1

Dr. Pampati is Irvin's treating rheumatologist.  On Irvin's initial visit, Dr. Pampati's assessed him with "chronic rheumatoid arthritis," for which he prescribed medication.  [R. 252]. He notes that Irvin refused some of his recommended treatment.  [*Id.*] Further, in describing the extent of the Irvin's limitations caused by the rheumatoid arthritis, Dr. Pampati noted, "it is also my impression that my patient is completely disabled for any occupation."  [Tr. 253].  On the same day, he drafted a letter addressed "[t]o whom it may concern," in which he certified that Irvin was under his care and "totally incapacitated permanently."  [Tr. 240].  Irvin believes the ALJ erred in not giving proper weight to this opinion.

As an initial matter, Dr. Pampati's comments about Irvin's functionality can hardly be considered a medical opinion, but is instead a determination of disability, which is reserved to the Secretary.  *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (citing 20 C.F.R. § 404.1527(e)(1)).  As a result, "no special significance will be given to opinions of disability, even if they come from a treating physician." *Id.* (citing 20 C.F.R. § 404.1527(e)(3) (2006); SSR96–5: Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed.Reg. 34471, 34473 (Soc. Sec. Admin. July 2, 1996)) (internal quotes omitted).

Even though a treating physician's opinion on an issue reserved to the Commissioner does not receive controlling weight, the ALJ must still "explain the consideration given to the treating source's opinion(s)." *Id.* (citing SSR96–5: Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 Fed.Reg. at 34474).  In considering Dr. Pampati's opinions, ALJ Spanger began by stating, "[a]s for the opinion

evidence, the undersigned gives little weight to Dr. Pampati's opinion that the claimant is permanently disabled." [Tr. 16]. However, unlike his counterpart in *Wilson*, ALJ Spangler did not stop with a summary conclusion, but went on to explain that he reached this conclusion because Dr. Pampati's opinion is "contradicted by medical evidence showing a decrease in symptoms with medication." [*Id*.] The ALJ specifically cites to the portions of the record demonstrating the inconsistency that he has noted. The first is the previously referenced letter in which Dr. Pampati usurps the role of the Secretary in opining that Irvin is "totally incapacitated permanently." [Tr. 16; Tr. 240]. He contrasts that with Dr. Pampati's own treatment notes, wherein he indicates that medication – which is to say, the medication not refused by Irvin – had helped improve Irvin's symptoms. [Tr. 16; Tr. 390].[3] Without further explanation from Dr. Pampati, there is facial inconsistency between these treatment notes and Dr. Pampati's letter.[4]

Finally, ALJ Spangler also notes that, "Dr. Pampati was contacted on two occasions to provide a function by function assessment of the claimant's abilities, but did not respond." [Tr. 16]. The record reflects that both Irvin's attorney and ALJ Spangler unsuccessfully attempted to reach Dr. Pampati for the purpose of obtaining a formal residual functional capacity assessment

---

[3] In his Response, Irvin claims that record is actually devoid of any documentation that the medication helped improve his symptoms. However, in Irvin's follow-up visit with Dr. Pampati on September 20, 2010, Dr. Pampati states in his treatment note, "The patient continues to have presence of stiffness, swelling, and pain, occasionally he had stiffness lasting for about two hours. He has been on prednisone 5 mg dialing and also on Arava, which he has tolerated. However, *he tells me the effect wear off by two in the evening*." [Tr. 390]. Dr. Pampati responds by increasing the amount of prednisone to 10 mg. [*Id*.] In the relatively limited amount of information provided from Dr. Pampati, ALJ Spangler's interpretation of this statement to mean that Irvin's medication was addressing some of his symptoms is reasonable and logical. Otherwise, what else could be the "effect" that is wearing off or the reasons to increase the prescription amount? [Tr. 390]. Additionally, Irvin's credibility in making this argument is somewhat weakened by the fact to he refused medication that Dr. Pampati clearly believed would also address he symptoms. [Tr. 252; Tr. 306].

[4] Additionally, further inconsistencies of Dr. Pampati's records not noted by the ALJ also support this conclusion. For example, on the same day in which Dr. Pampati issued his opinion as to Mr. Irvin's functionality, he also documented  in his treatment notes that, "the patient is a moderately built middle-aged *woman*, who appeared to be in no distress." [Tr. 252]. (emphasis added). In addition, Dr. Pampati's conclusion that Irvin was "completely disabled for any occupation" and that this effect was permanent, was given on Irvin's initial visit before any of the treatment that Dr. Pampati indicated might be helpful had even been attempted. [R. 253; R. 240].

10

from him.  [Tr. 409; Tr. 418; Tr. 26].  At the administrative hearing, Irvin's attorney indicated

that Dr. Pampati "doesn't fill out forms and doesn't respond to those requests for information

with regard to Social Security's regulations and requirements."  [Tr. 26].  Dr. Pampati is, of

course, not required by law to complete an RFC Assessment, but his failure to do so significantly

limits the amount of information in the record detailing and explaining his opinion. Noting the

absence of the more detailed RFC Assessment, ALJ Spangler explained, with specific examples

and direct citation to the record, that he gave little weight to Dr. Pampati's summary opinion

because it conflicted with his treatment notes.  [Tr. 16].  This explanation is sufficiently detailed

to enable Irvin to understand why his treating physician's opinion was granted little weight and

also to permit judicial review.  *Wilson,* 378 F.3d at 544 ; *Hall v. Comm'r of Soc. Sec.*, 148 F.

App'x 456, 464 (6th Cir. 2005); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470

(6th Cir. 2006). Further, due to the nature of Dr. Pampati's opinion and the substantial evidence

of the record, the ALJ was justified in according little weight to Dr. Pampati as Irvin's treating

rheumatologist.

2

Substantial evidence also supports ALJ Spangler's decision as to Kristie Smith, ARNP at

Mountain Comprehensive Care, who initially referred Irvin to Dr. Pampati.  As conceded by

Partin, ARNP Smith is not "an acceptable medial source," and therefore she cannot be

considered a treating source, "whose opinions may be entitled to controlling weight."  [Tr. 12-1

at 11; Social Security Ruling 06-03p].  Irvin is correct that the ALJ should still consider the

opinions the non-acceptable medical source, but the ALJ has discretion to determine the

appropriate weight to accord it.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.

1997).  That is to say, the ALJ must only weigh it along with all other evidence in the record.  *Id.*

ARNP Smith did not complete a physical residual functional capacity assessment, but submitted a physician's statement.  [Tr. 407].  This letter was not structured in the detailed form of the RFC assessment and made no citation to supporting medical records.  Instead, the brief letter merely stated several of the summary conclusions of ARNP Smith about her patient.  She opined that Irvine would have to miss five to six working days per month due to his condition. [*Id*.]  She states that several days per month he would need to change position every fifteen minutes.  [*Id*.]  Further, ARNP Smith indicated her belief that Irvin was significantly limited ability to perform both fine and gross manipulation, and that he would have to take up to ten bathroom breaks per day.  [Id.].

ALJ Spangler, expressly considered the opinions of ARNP Smith and found them to be too speculative and not supported by the other record evidence.  The ALJ specifically attacked the reliability of ARNP Smith's conclusion that Irvin would have to miss five to six days a week of work per month, a fact which he stated was supported by "no medical evidence." [Tr. 16]. ALJ Spangler also noted that record did not support the ARNP's finding that Irvin was significantly limited in terms of fine and gross manipulation.  [*Id*.].  As previously discussed, the extent to which Irvin participated in household chores and accomplished daily life activities militates against a finding that Irvin has such substantial limitations in fine and gross manipulation.  [Tr. 16; Tr 169].  It is clear from the ALJ's written decision that, as required, he gave proper consideration to ARNP Smith's opinion before ultimately according it little weight, and substantial evidence from the record supports this conclusion.  *Walters,* 127 F.3d at 531 (6th Cir. 1997).  As a result, the court need not remand this case to enable to enable the agency physicians the opportunity to review ARNP's statement or to allow the ALJ to incorporate her opinions into his residual functional capacity determination.

12

C

Irvin next contends that his own allegations were improperly rejected by the ALJ without a proper credibility determination under 20 C.F.R. § 404.1529.  In determining whether a claimant is disabled, the Commissioner considers statements or reports from the claimant.  20 C.F.R. § 404.1529. To determine whether statements of a claimant are credible, ALJ's employ the following two-part test:

> First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)) (internal citations omitted).  In 20 C.F.R. § 404.1529, the Social Security Administration informs claimants that, in certain credibility determinations, the following factors should guide the analysis of  the agency decision makers:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529; *see also, Felisky v. Bowen*, 35 F.3d 1027, 1037 (6th Cir. 1994).

Importantly, it is within the province of the ALJ, rather than the reviewing court, to evaluate the credibility of claimant. *Rogers*, 486 F.3d at 247 (citing *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir.1990); *Kirk v. Sec'y of*

*Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981)). Even so, the credibility determinations of the ALJ must be reasonable and supported by substantial evidence.  *Id*. at 249.

ALJ Spangler cited the correct test and found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [Tr. 16].  Then, counter to the representations of Irvin, the ALJ expressly sets forth three direct examples to support this conclusion.  First, the decision notes that Irvin's contentions of diffuse joint pain is inconsistent with Irvin's daily activities, which include washing dishes, folding laundry, taking out the trash, watering plants, feeding the cat, and preparing microwave meals.  [Tr. 16; Tr. 169].  Second, despite Irvin's characterization of the severity of his symptoms, the Dr. Pampati's treatment notes show that he responded positively to treatment and demonstrated minimal chronic changes in the wrist and MCP joints.  [Tr. 16; Tr. 390].  Finally, the record reveals no evidence of acute or active synovitis.  [Tr. 16; 390].  ALJ Spangler's analysis employs the proper test and directly addresses factors that the agency has bound itself to consider.  In so doing, ALJ Spangler has conducted a proper credibility determination, which the Court's independent review has found to be reasonable and supported by substantial evidence from the record.

D

Finally, Irvin claims that the residual functional capacity adopted by the ALJ and reflected in the hypothetical question upon which the ALJ relied was defective because it failed to accurately depict the restrictions assessed by the sources whose opinions the ALJ chose to adopt.  A claimant's residual functional capacity represents the most that he can still do in a work

14

setting despite his limitations. 20 C.F.R. § 416.945.  This decision is to be made by the

Administrative Law Judge after reviewing the entire record.  20 C.F.R. 404.1520(e); 416.920(e),

404.1545; 416.945; SSR 98-8.  In fulfilling that duty and assessing Irvin's residual functioning

capacity, ALJ Spangler stated as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 C.F.R 404.1567(b) and 416.967(b) except the claimant is limited to no more
> than occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; stooping,
> kneeling, crouching, and crawling.  The claimant can lift 20 pounds occasionally
> and 10 pounds frequently.  He can sit for six hours, and stand/walk for six hours
> in an eight hour day.

[Tr. 15].  The ALJ incorporated this RFC into the first hypothetical question that he posed to

vocation expert, Dr. Julian M. Nadolsky.  [Tr. 48].  Relying on the testimony of the VE, ALJ

Spangler found that though Irvin's limitations precluded him from returning to his past work,

there existed a significant number of jobs in the national economy that the claimant could

perform. [Tr. 17-18; Tr. 47-48]

 "In order for a vocational expert's testimony in response to a hypothetical question to

serve as substantial evidence in support of the conclusion that a claimant can perform other

work, the question must accurately portray a claimant's physical and mental impairments. *Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) (citing *Howard v. Comm'r of Soc. Sec.,*

276 F.3d 235, 239 (6th Cir.2002) *See* (6th Cir.2002); *Webb v. Comm'r of Soc. Sec.,* 368 F.3d

629, 633 (6th Cir.2004)).  That is to say, that though the hypothetical question need not contain

an exhaustive list of the claimant's medication condition, "the ALJ must include in the question

an accurate calculation of the claimant's residual functional capacity—i.e., a description of what

the claimant can and cannot do." *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 453 (6th Cir.

2007) (citing *Howard,* 276 F.3d at 239); *Webb,* 368 F.3d at 633 ("In *Foster v. Halter,* 279 F.3d

348 (6th Cir.2001), we stated that a hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions.") (internal quotes omitted).

Irvin does not claim that the VE's conclusion does not address the hypothetical question given or that the hypothetical question does not mirror the RFC.  Irvin's complaint is that the RFC itself does not adequately entail all of the limitations that ALJ had approved of, and thus the VE's response to the hypothetical question crafted from that RFC cannot constitute substantial evidence that other jobs exist in the national economy that Irvin could perform.  As previously noted, Drs. Hernadez and Loy, the agency physicians who evaluated Irvin's case, found that he was afflicted with both postural and manipulative limitations. [Tr. 306-07, Tr. 360-61].  Specifically, in terms of the manipulative limitations, the agency physicians found that Irvin was limited to frequent reaching in all directions, handling (gross manipulation), fingering (fine manipulation); and feeling (skin receptors).  [*Id.*]  As is facially obvious, the RFC set forth by the ALJ expressly incorporated the postural limitations, but not these manipulative limitations. [Tr. 15; Tr. 306-07; Tr. 306-361].[5]

The Commissioner argues that this is not error.  She points to the concluding language in the ALJ's discussion of the RFC, wherein he stated, "In sum, the above residual functional capacity assessment is supported by the medical evidence showing improvement in symptoms with medication.  The claimant was given the benefit of the doubt, and the RFC includes limitations on postural activities." [Tr. 16].  In the Commissioner's view, the implication from this statement is that the ALJ only accepted the postural limitation, and by negative inference

---

[5] In his response, Irvin maintains that the RFC did not adequately incorporate the postural limitation of climbing either; however, the record clearly reflects otherwise.  Dr. Hernandez and Loy limited Irvin to occasional stair climbing.  [Tr.. 306; R. 360].  ALJ Spangler's RFC noted that Irvin is limited to no more than occasional climbing of stairs.  [Tr. 15].  The relevant hypothetical question assumed that the individual was limited to light exertion with no more than occasional climbing.  [Tr. 48].  It is unclear what more ALJ Spangler could have done to incorporate this limitation to the satisfaction of Irvin.

excluded manipulative limitations.  And in general, the Commissioner might be right.  After all, as previously stated, the ALJ was not required to incorporate the findings of Dr. Pampati an ARNP Smith, which he found that were not supported by the record.  The same could conceivable apply to the agency physicians here as well.  Further, as stated, in other parts of his decision, the ALJ indicated that Irvin was not as limited in manipulation as ARNP Smith opined, and that Irvin did not demonstrate an inability to perform gross and fine manipulation effectively to satisfy Listing 14.09.  [Tr. 14; Tr. 16].  However, these are inference and implications, and what the ALJ expressly stated in his report contradicts them.  Immediately after articulating the RFC, the ALJ stated, "[t]he abovementioned RFC mirrors State agency findings at Exhibits 6F and 9F that indicate the claimant can perform a range of light work.  These findings are supported by medical evidence in its entirety." [Tr. 15].  In making this statement, the ALJ seems to completely accept the findings of the agency physicians, Drs. Hernandez and Loy (Exhibits 6F and 9F); however, in crafting the RFC he omits several limitations that they identified.  [Tr. 15; Tr. 306; Tr. 360].  Because the hypothetical question is based on an RFC assessment that does not encompass all of the limitations found by the ALJ, the VE's answer to it may not constitute substantial evidence for the ALJ's conclusion at Step Five that other jobs exist in the national economy that Irvin could perform.

It is clear that this is error, but the Commissioner argues alternatively that it is harmless and so remand is not required.  Based on the VE's answer to his hypothetical, the ALJ determined that though Irvin could not return to his past work, there are jobs that exist in significant numbers in the national economy that Irvin could perform.  [Tr. 17-18].  In reviewing the transcript, it is notable that before asking the hypothetical question, the ALJ directly cited that report of Dr. Hernandez and noted that the question was based on that assessment.  [Tr. 48;

17

Tr. 306].  The VE responded to the hypothetical question that "there's many, many light jobs a person could perform with those – with the limitations in that hypothetical."  [Tr. 49].  Among the jobs specifically enumerated and then subsequently set forth by the ALJ in his decision were unarmed security guard, delivery person, flagman, ticket taker, and grinding machine operator.[6] [Tr. 17-18; Tr. 48-49].  As noted by the Commissioner, and confirmed by the Court's independent review of the DOT, each of these jobs could not only be performed by someone with the limitations of the hypothetical, but also someone with the exact limitations assessed to Irvin by the agency physicians, Drs. Hernandez and Loy.  Specifically, Drs. Hernandez and Loy indicated that Irvin had manipulative limitations that would only allow him to engage in frequent reaching, handling, and fingering.  [Tr. 306-307; Tr. 360-361].  This means that Irvin could engage in those activities between one-third to two-thirds, or about 5.3 hours, of an eight hour work day.  [Tr. 304; Tr. 307; Tr. 358; Tr. 361].. [*Id.*]  According to the DOT, which provides information regarding the demands of jobs as they are generally performed in the national economy, the jobs of unarmed security guard, delivery person, flagman, ticket taker, and grinding machine operator, never require more than frequent reaching and handling and never more than occasional fingering. *See* United States Dep't of Labor, Dictionary of Occupational Titles §§ 372.667-034 (1991 WL 673100); 230.663-010 (1991 WL 672160); 372.667-022 (1991 WL 673097); 344.667-010 (1991 WL 672863); 690.685-194 (1991 WL 678545) (4th ed. Rev. 1991).  Thus, even though the RFC and the hypothetical question posed by the ALJ did not contain all of the relevant limitations, the jobs selected by the ALJ to demonstrate his conclusion at Step Five did.

---

[6] The ALJ also stated that "oil inspector," was a an available job that Irvin could do.  However, as the Court's independent review of the DOT did not specifically reveal such a job, it has been omitted from the analysis above.

Admittedly, as recognized by Irvin, courts have remanded cases back to the ALJ when the hypothetical question does not properly take into consideration all of the claimant's limitations.  For example, Irvin cites *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 514-17, wherein the Sixth Circuit considered a similar situation.[7]  The ALJ's hypothetical question did not contain limitations that had been assessed the claimant by the state psychologists whose opinions the ALJ had accepted.  The Court concluded, "[b]ecause the controlling hypothetical inadequately described Ealy's limitations, the expert's conclusion that Ealy could work as an assembler, inspector, packer, or production worker does not serve as substantial evidence that Ealy could perform this work.  *Id.* at 517.  However, *Ealy* is somewhat distinct from this case.  Specifically, the limitations omitted in those hypothetical questions were in concentration, persistence, and pace, each of which were required to "sustained degree to perform the jobs identified by the VE and adopted by the ALJ.  *Id.*  Still, at least on district court has considered the specific argument of the Commissioner under the same circumstances of this case and, citing *Ealy*, found that the error was not harmless. That court reasoned:

> Considering the complete absence from the VE hypothetical of a restriction to "simple, routine and repetitive" tasks and because the burden shifts to the Commissioner at Step Five, the ALJ's error was not harmless and the ALJ's Step Five determination cannot be said to be supported by substantial evidence. Thus, reversal and remand is warranted for further vocational expert testimony based on a hypothetical question or questions that completely and accurately describe Plaintiff's RFC limitations.

*Osborne v. Comm'r of Soc. Sec. Admin.,* 1:12-CV-01904, 2013 WL 5221107 at * 12 (N.D. Ohio Sept. 17, 2013).

---

[7] Irvin also cites *Cole v. Commissioner of Social Security*, 652 F.3d 653, 660 (6th Cir. 2011);  however, that specific opinion was amended upon rehearing, removed from the official reporters, and subsequently decided by separate opinion on other grounds.   *See Cole v. Astrue*, 661 F.3d 931, 934 (6th Cir. 2011).

However, this Court is not bound by the decision of this district court and is not persuaded by its rationale.  This Court does not read *Ealy* as requiring an automatic remand if the hypothetical question does not completely encompass all of the claimant's limitations. Concerning errors made by administrative law judges in the social security context, the Sixth Circuit has stated as follows:

> We have recognized that "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson,* 378 F.3d at 545; *see also* 5 U.S.C. § 706(2)(D) ("The reviewing court shall ... hold unlawful and set aside agency action ... found to be ... without observance of procedure required by law."); *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."). Generally, however, we review decisions of administrative agencies for harmless error. *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 535 (6th Cir.2001); *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality"). Accordingly, if an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Serv. Comm'n,* 721 F.2d 1054, 1056 (6th Cir.1983); *see also Am. Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party).

*Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654-55 (6th Cir. 2009).  In the same case, the Sixth Circuit went on to note that it had been hesitant to grant exceptions from this general rule.  *Id.* at 656 ("*Wilson*'s circumscribed form of harmless error review has not been applied outside the context of the reasons-giving requirement of § 404.1527(d)(2), and we decline the invitation to extend it to this case.").

It is unclear to this Court what harm Irvin has suffered by the ALJ's error or what purpose would be served by remanding this case.  It is true that the ALJ erred in failing to

include in the RFC assessment all of the limitations that he himself had found supported by the record.  It is true that this RFC was used to create the hypothetical question asked the VE. However, the ALJ also indicated at the hearing that the hypothetical question was based on the findings of Dr. Hernandez.  [Tr. 48].  Further, the jobs listed by the VE and adopted by the ALJ did actually adhere both the express limitations of the hypothetical questions and those from the agency physicians that were omitted from the RFC.  [Tr. 48-49; Tr. 17-18].  Thus, whether or not the RFC and the hypothetical question accounted for all of Irvin's limitations, the fact remains that the procedure employed by the ALJ has shown that jobs do exist in significant numbers in the national economy that the claimant can perform, even with actual limitations he has been assessed.  As a result, the ALJ's error is harmless and, as with the previous arguments raised by Irvin, remand is not required.

III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

(1)     Plaintiff's Motion for Summary Judgment [R. 7] is **DENIED**;

(2)     Defendant's Motion for Summary Judgment [R. 8] is **GRANTED**

(3)     **JUDGMENT** in favor of the Defendant will be entered contemporaneously herewith.

This the 30th day of September, 2013.



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**

21